IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,087

GARY L. WOESSNER, Deceased,
*Appellee*,

v.

LABOR MAX STAFFING and XL SPECIALTY INSURANCE COMPANY,
*Appellants.*

SYLLABUS BY THE COURT

1.

Interpretation of the Kansas Workers Compensation Act, K.S.A. 2019 Supp. 44-501 et seq., is a question of law subject to unlimited review.

2.

On questions of statutory interpretation, an appellate court owes no deference to interpretations given to the Kansas Workers Compensation Act by the Workers Compensation Board.

3.

Interpretation of an administrative regulation is a question of law subject to unlimited review without deference to the agency's interpretation.

4.

Clear and convincing evidence is evidence causing the fact-finder to believe the truth of the facts asserted is highly probable.

1

Review of the judgment of the Court of Appeals in 56 Kan. App. 2d 780, 437 P.3d 992 (2019). Appeal from the Workers Compensation Board. Opinion filed August 28, 2020. Judgment of the Court of Appeals reversing the Workers Compensation Board and remanding with directions is reversed. Judgment of the Workers Compensation Board is affirmed.

*J. Scott Gordon* and *Daniel C. Estes*, of McCormick, Gordon, Bloskey & Poirier, PA, of Overland Park, were on the briefs for appellant.

*Frank D. Taff*, of Topeka, was on the briefs for appellee.

The opinion of the court was delivered by

BILES, J.: Gary L. Woessner died after falling 15 feet from a jobsite catwalk for no apparent reason. His widow was awarded death benefits under the Kansas Workers Compensation Act. The employer appealed. In the claim proceedings leading up to this court's review, sharp disagreements focus on two points: (1) a drug test's admissibility showing Woessner had a large quantity of marijuana metabolites in his system; and (2) whether clear and convincing evidence demonstrated drug impairment did not contribute to the accident. See *Woessner v. Labor Max Staffing*, 56 Kan. App. 2d 780, 781, 437 P.3d 992 (2019). How these disputes are resolved determines whether benefits were properly awarded.

Under the Act, an employer is not liable when an employee's work-related injury was contributed to by that employee's marijuana consumption. K.S.A. 2019 Supp. 44-501(b)(1)(A). And the law conclusively presumes an employee was impaired if testing shows a concentration of marijuana metabolites at the time of injury at or above a statutorily set level. K.S.A. 2019 Supp. 44-501(b)(1)(C). The law also creates a rebuttable presumption that the accident was contributed to by that impairment, which the employee can overcome by clear and convincing evidence. K.S.A. 2019 Supp. 44-501(b)(1)(D).

2

Woessner's test results were well above the statutory level needed to trigger these presumptions.

We hold the drug test results were admissible but agree with the Workers Compensation Board that clear and convincing evidence shows the conclusively presumed impairment did not contribute to Woessner's accident. We affirm the Board's award.

FACTUAL AND PROCEDURAL BACKGROUND

While working for Labor Max Staffing at a feed mill, Woessner fell from a catwalk and suffered a severe traumatic head injury. No one saw him fall, and the cause remains unexplained. He died about six months later.

Woessner was taken by ambulance to Stormont-Vail Hospital in Topeka. Dr. Nason Lui, the emergency room on-call trauma surgeon, followed hospital protocols for an unconscious patient and ordered blood and toxicology screens. The toxicology screen was performed on a urine sample from a catheter. It indicated a positive result for THC, marijuana's psychoactive ingredient, at a level of at least 50 ng/ml of urine.

During Woessner's months of treatment at various facilities, Labor Max paid workers compensation benefits for his temporary total disability and for his treatment and care. Labor Max requested additional testing of the urine sample stored at Stormont-Vail. LabCorp performed GC/MS (gas chromatography/mass spectrometry) confirmatory testing and obtained a positive result with a confirmed level of 189 ng/ml of marijuana metabolite. State law triggers the conclusive impairment presumption at or above 15 ng/ml of marijuana metabolite. See K.S.A. 2019 Supp. 44-501(b)(1)(C).

3

Labor Max stopped paying on the workers compensation claim. See K.S.A. 2019 Supp. 44-501(b)(1)(A) (disallowing compensation when the employee's injury, disability, or death was contributed to by the use or consumption of alcohol or drugs). This set the stage for further workers compensation proceedings on behalf of Woessner's widow, Carmen Woessner.

At a regular hearing before an administrative law judge, the parties agreed the only contested issue was whether marijuana intoxication relieved Labor Max's liability to pay workers compensation benefits. After reviewing the evidentiary record, then consisting of several witnesses' depositions, the administrative law judge turned to the exhibits the parties marked to be offered at the hearing. Two Labor Max exhibits are relevant to this appeal. The first (Exhibit B) is a "chain of custody" affidavit from Shelley D'Attilio, Stormont-Vail's laboratory services director. The second (Exhibit C) is a "chain of custody" affidavit from David St. John, the lab supervisor for the LabCorp facility that tested the stored urine sample.

D'Attilio's affidavit contained her sworn statements that she knew the facts based upon her review of the records kept by Stormont-Vail in the ordinary course of business and her knowledge of the lab's procedures. She identified each recorded step in handling the sample beginning with its collection. She detailed the records of the sample's screening and long-term storage. And she swore access to the storage location was limited to Stormont-Vail laboratory toxicology staff. She outlined Stormont-Vail's record of the processing of LabCorp's request for a portion of the sample and its retrieval and transfer to a LabCorp courier by a Stormont-Vail employee.

Two documents were attached to D'Attilio's affidavit. One was a chain-of-custody form sent to LabCorp with the urine sample. It referred to the specimen number and was signed by the Stormont-Vail lab employee who retrieved the sample from long-term

4

storage and delivered it to the "LabCorp Courier." The other document was the Stormont-Vail drug screening-test result report. It showed a positive result for THC with a cutoff value of 50 ng/ml. It also stated: "Results not confirmed. May not meet forensic requirements. Confirmation by GC/MS available upon request."

St. John's affidavit similarly laid out his LabCorp facility's records of the sample's handling. It indicated St. John reviewed the business records from the lab related to the sample's testing. He believed they detailed each event at or near the time something happened. St. John swore that: LabCorp received the sample with no evidence of tampering; lab personnel then handled it under proper procedures, including keeping chain-of-custody documentation; LabCorp staff used the GC/MS method, which found a positive result for marijuana metabolites; this result was confirmed and reported by a certifying scientist; and the lab was federally certified for drug testing.

The documents attached to St. John's affidavit included the LabCorp drug test results. Those results were reflected in both St. John's letter report showing marijuana metabolites at a level of 189 ng/ml confirmed by GC/MS analysis, and a "Laboratory Data Package" containing the lab documents relating to testing, confirmation, and chain-of-custody for the urine sample.

The ALJ admitted both exhibits over Carmen's hearsay and foundation objections.

After the hearing, Dr. Christopher Long, a board-certified forensic toxicologist, testified in an evidentiary deposition as an expert witness for Labor Max. When discussing Exhibit C, Dr. Long noted the LabCorp sample identified marijuana metabolites in the amount of 189 ng/ml. He said, if an individual smoked a "single joint, you'd be lucky to test positive for 24 hours" or, "[a]t most, if it was a big joint, three days." He admitted "if you're taking a heavier dose, then, yes, it could go up to a week."

5

But Dr. Long disagreed with LabCorp that prolonged marijuana use could show up in urine samples one to two months later.

Dr. Long admitted that "I don't know if [Woessner's] death was contributed to by the marijuana. Other than the fact that it's present, that's all I can state." And he could not say "the active ingredient was present because they didn't test for it. So I don't know the level of impairment." He explained the subjective, hallucinogenic nature of marijuana meant that "[g]enerally," a layperson could not determine when someone else had consumed it. But he admitted it was possible that an individual who had consumed marijuana would smell of it, would have reddened eyes or a cough, or would appear restless, or unable to concentrate—although he judged some of these possible symptoms "not probable."

In support of the compensation claim, Carmen testified she did not see Woessner the morning of his accident. He had spent the night with their daughter and grandchildren. Carmen was aware of only one instance in which Woessner consumed marijuana. This was when he smoked it over lunch about a month before the accident. She said that because she "was with him most of the time" and had never seen him use marijuana, she "figured that was just an isolated thing." She also represented their daughter reported Woessner had not consumed marijuana around her the night before the accident.

Carmen also presented testimony from mill assistant Thomas McGraw, who worked with Woessner every day at the mill, although Woessner worked in sanitation. They were not social acquaintances. McGraw testified Woessner was cleaning a catwalk in the mill the day of the accident. Shortly before Woessner's fall, McGraw spent between 10 and 15 minutes near him while loading a truck on the mill's catwalk. McGraw estimated he saw Woessner "no more than five minutes" before the fall. He

6

appeared "normal" to McGraw that day: he did not seem restless, drowsy, sleepy, agitated, anxious, restless, hostile, withdrawn, unresponsive, or paranoid.

McGraw did not notice anything wrong with Woessner before he fell. He did not notice whether Woessner's eyes were reddened and did not notice any unusual odors about Woessner's person. He did not stumble, did not appear to have tremors in his hands, and did not have a cough. McGraw characterized Woessner as "a good worker" whom he had observed many times before. And on the day he fell, Woessner was "always pretty much the same" as he had been previously. But McGraw conceded he had no expertise in identifying drug impairment symptoms.

The ALJ, Board, and Court of Appeals each took different stances on the admissibility of the LabCorp drug test results and whether Carmen's evidence overcame the statutory causation presumption. The test results' admissibility was debated through the lens of three authorities: K.S.A. 2019 Supp. 44-501(b)(3), which sets out conditions for admitting the chemical test results from a sample collected by the employer; K.A.R. 51-3-5a, which details the process for admitting "[m]edical reports or any other records or statements"; and typical evidentiary requirements for workers compensation hearings.

The ALJ deemed the drug test results admissible over Carmen's hearsay and foundation objections. His factual findings included information gleaned from both Exhibits B and C, including the crucial fact that GC/MS analysis of Woessner's urine sample "confirmed the presence of a marijuana metabolite at the level of 189 ng/mL." The ALJ ruled K.S.A. 2019 Supp. 44-501(b)(3) did not apply. His order did not address the regulation or standard evidentiary rules. The ALJ held based on the test results that "Woessner is conclusively presumed to have been impaired due to marijuana." He also concluded Carmen failed to demonstrate by clear and convincing evidence that

7

Woessner's impairment did not contribute to his accident, injury, and death. Therefore, the ALJ ruled Woessner's injuries were not compensable.

The Board reversed the ALJ. It ruled the test results were inadmissible for lack of evidentiary foundation as, in its view, was required by the statute, the regulation, and the default evidentiary requirements. In addition, it found, even if Woessner was impaired, the impairment did not contribute to his accident. The Board concluded his injuries were compensable and awarded the authorized benefits.

Labor Max sought judicial review of the Board's decision. A split panel of the Court of Appeals vacated the award and remanded the claim to the Board. The panel majority held the Board erred as a matter of law when it excluded the exhibits, reasoning that neither the statute nor the regulation excluded them, and they were sufficiently reliable to be admissible. *Woessner*, 56 Kan. App. 2d at 799. The panel majority also held the record was insufficient concerning the Board's finding that Woessner's impairment did not contribute to the accident for meaningful appellate review, so it remanded that issue for additional proceedings. 56 Kan. App. 2d at 801-02. In a dissenting opinion, Judge Henry Green Jr. agreed the statute did not bar admission of the results, but argued the regulation did. 56 Kan. App. 2d at 803, 811-12.

Carmen timely petitioned this court for review, which we granted. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

ANALYSIS

Whether the Board properly awarded benefits requires us to consider two questions: (1) the drug test's admissibility showing Woessner had a large quantity of marijuana metabolites in his system; and (2) whether clear and convincing evidence demonstrated drug impairment did not contribute to the accident.

*Scope of Review for Board Decisions*

The Board's decision is subject to review under the Kansas Judicial Review Act, K.S.A. 77-601 et seq. K.S.A. 2019 Supp. 44-556(a). The party challenging it—in this instance Labor Max—bears the burden of proving the agency action was invalid. K.S.A. 77-621(a)(1). The reviewing court may grant relief only for statutorily enumerated reasons, which include three relevant for this appeal: the agency erroneously interpreted or applied the law; the agency action was based on a factual determination not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole; and the agency action was otherwise unreasonable, arbitrary, or capricious. K.S.A. 77-621(c)(4), (7), (8). And "[i]n making the foregoing determinations, due account shall be taken by the court of the rule of harmless error." K.S.A. 77-621(e).

*Admission of the Lab Test Results*

Our first issue is whether the Board erroneously excluded the LabCorp results reflecting Woessner's intoxication. This is of paramount importance to the compensability of Woessner's accident and death because compensation is not allowed if Labor Max proves Woessner's "use or consumption" of marijuana contributed to his "injury, disability or death." K.S.A. 2019 Supp. 44-501(b)(1)(A). And a "GCMS confirmatory test" reflecting a marijuana metabolite concentration of at least 15 ng/ml at the time of the injury vastly simplifies what is needed to defeat this claim by triggering

9

(1) a conclusive presumption Woessner was impaired; and (2) a rebuttable presumption the impairment contributed to his accident, injury, or death. See K.S.A. 2019 Supp. 44-501(b)(1)(C), (D).

Admissibility turns on the Board's three holdings. First, there was insufficient foundation for the test results' admission under K.S.A. 2019 Supp. 44-501(b)(3) (required conditions for admission of chemical tests). Second, K.A.R. 51-3-5a separately barred admission. And third, general evidentiary rules for workers compensation hearings precluded their admission. We consider each next.

*K.S.A. 2019 Supp. 44-501(b)(3)*

The panel held the Board erred by imposing K.S.A. 2019 Supp. 44-501(b)(3)'s foundation requirements to exclude the test results. The Board's rationale was that Labor Max did not support them with foundation testimony satisfying K.S.A. 2019 Supp. 44-501(b)(3)(A)-(F). The panel unanimously held this was error. See *Woessne*r, 56 Kan. App. 2d at 795 ("The Board made a legal error by relying on this statute to exclude the lab-test result."); 56 Kan. App. 2d at 803 (Green, J., dissenting) ("The Board clearly erred by applying [the statute] to exclude the admission of Gary's GC/MS test results since medical staff collected Gary's urine sample."). We agree.

Interpretation or construction of the Workers Compensation Act is a question of law. "Appellate courts exercise unlimited review on questions of statutory interpretation without deference to an administrative agency's or board's interpretation of its authorizing statutes." *Redd v. Kansas Truck Center*, 291 Kan. 176, Syl. ¶ 4, 239 P.3d 66 (2010).

K.S.A. 2019 Supp. 44-501(b)'s relevant portions provide:

"(2) The results of a chemical test shall be admissible evidence to prove impairment if the employer establishes that the testing was done under any of the following circumstances:

. . . .

(B) during an autopsy or in the normal course of medical treatment for reasons related to the health and welfare of the injured worker and not at the direction of the employer;

. . . .

"(3) Notwithstanding subsection (b)(2), the *results of a chemical test performed on a sample collected by an employer* shall not be admissible evidence to prove impairment unless the following conditions are met:

(A) The test sample was collected within a reasonable time following the accident or injury;

(B) the collecting and labeling of the test sample was performed by or under the supervision of a licensed health care professional;

(C) the test was performed by a laboratory approved by the United States department of health and human services or licensed by the department of health and environment, except that a blood sample may be tested for alcohol content by a laboratory commonly used for that purpose by state law enforcement agencies;

(D) the test was confirmed by gas chromatography-mass spectroscopy or other comparably reliable analytical method, except that no such confirmation is required for a blood alcohol sample;

11

(E) the foundation evidence must establish, beyond a reasonable doubt, that the test results were from the sample taken from the employee; and

(F) a split sample sufficient for testing shall be retained and made available to the employee within 48 hours of a positive test." (Emphasis added.) K.S.A. 2019 Supp. 44-501(b).

The Board's application of subsection (b)(3) to exclude the test results was plainly wrong. It requires as a condition precedent that the "sample" must be "collected by the employer." But Labor Max did not collect the tested urine sample. Stormont-Vail's treating personnel did. Subsection (b)(3) does not govern the test results' admissibility.

The Board disregarded the required condition precedent by reasoning that not applying the statute's standards set forth in subsection (b)(3) "would permit questionable drug test results to be admissible." But that this concern does not justify ignoring the statutory language. "'When a statute is plain and unambiguous, a court must give effect to its express language, rather than determine what the law should or should not be.'" *Estate of Graber v. Dillon Companies*, 309 Kan. 509, 516, 439 P.3d 291 (2019). Public policy considerations, however sound, cannot upset the Legislature's intent as expressed in a statute's plain language. *Bussman v. Safeco Insurance Co.*, 298 Kan. 700, 729, 317 P.3d 70 (2014) (applying statute according to its plain language, "[n]otwithstanding any public policy considerations and regardless of what one might speculate that the legislature meant to do").

K.S.A. 2019 Supp. 44-501(b)(3) plays no role in determining the LabCorp test results' admissibility. The Board erred as a matter of law by concluding the statute was applicable.

*K.A.R. 51-3-5a*

The panel split over the regulation's application. The panel majority held the Board erred when it applied K.A.R. 51-3-5a(a) to exclude the test results. We agree this regulation does not bar the test results' admission.

Like statutory interpretation, interpreting an administrative regulation is a question of law subject to unlimited review, without deference to the agency's interpretation. *Pener v. King*, 305 Kan. 1199, 1208, 391 P.3d 27 (2017). If possible, a regulation "must be construed in harmony with the statute, so that it, as well as the statute, may be given effect." *Kansas Comm'n on Civil Rights v. City of Topeka St. Dep't*, 212 Kan. 398, 402, 511 P.2d 253 (1973).

K.A.R. 51-3-5a is captioned, "Procedure for preliminary hearings." It claims to be authorized by K.S.A. 44-573, and to implement K.S.A. 1996 Supp. 44-534a. The regulation provides:

> "(a) *Medical reports or any other records or statements shall be considered by the administrative law judge at the preliminary hearing. However, the reports shall not be considered as evidence when the administrative law judge makes a final award in the case, unless all parties stipulate to the reports, records, or statements or unless the report, record, or statement is later supported by the testimony of the physician, surgeon, or other person making the report, record, or statement*. If medical reports are not available or have not been produced before the preliminary hearing, either party shall be entitled to an ex parte order for production of the reports upon motion to the administrative law judge." (Emphasis added.)

The Board concluded the absence of testimony from the "person making" the report of the test results was fatal under the regulation because Carmen did not stipulate

13

to its admissibility. But the panel majority noted the Board misread the regulation. The panel majority held the regulation "relates to medical statements and records that are considered *at the preliminary hearing* without a doctor's testimony." (Emphasis added.) *Woessner*, 56 Kan. App. 2d at 797-98. It reasoned that applying it to the LabCorp test results was error because "[n]othing in . . . the regulation provides that reports of lab testing—not first presented in a preliminary hearing—are subject to any special evidentiary rules." 56 Kan. App. 2d at 799. The dissent disagreed, concluding the test results were "any other records or statements" within the regulation's meaning, and arguing, therefore, that under the regulation's plain language they could not be considered evidence when making the final award without the foundation testimony the Board observed was absent. 56 Kan. App. 2d at 810-11 (Green, J., dissenting).

Rejecting Judge Green's view, the panel majority held that giving a regulation dealing with preliminary hearing matters broader application was contrary to its plain language and inconsistent with the Workers Compensation Act as a whole. It explained:

"The Board reads 'reports, records, or statements' to apply to virtually anything, whether a medical record or not—and whether first presented at a preliminary hearing or not. That takes K.A.R. 51-3-5a far beyond its apparent reach. As we read K.A.R. 51-3-5a, it relates to medical statements and records that are considered at the preliminary hearing without a doctor's testimony. Later though, at least in nondeath cases, each side has the opportunity to have a doctor conduct a medical examination of the employee so that disability ratings may be obtained. See K.S.A. 2017 Supp. 44-515 and 44-516. Because of the importance of those examinations and ratings, another statute, K.S.A. 44-519, provides that 'no report of any examination . . . by a health care provider . . . shall be competent evidence . . . unless supported by the testimony of such health care provider . . . .' Read in light of K.S.A. 44-519 (requiring a doctor's testimony to support an examination report) and K.S.A. 2017 Supp. 44-534a (providing that preliminary hearings be summary in nature), the regulation, K.A.R. 51-3-5a, makes sense. It allows a doctor's report to be admitted at a preliminary hearing without testimony but warns all

14

parties that testimony will be needed later. Reading K.A.R. 51-3-5a as the Board does—to apply to virtually all documents or statements—would eviscerate the general rule that hearsay evidence is admissible in workers'-compensation hearings." *Woessner*, 56 Kan. App. 2d at 797-98.

The panel majority reached two conclusions about the regulation's application to the facts of this case:  (1) a test result is not a "report, record, or statement[ ]" within the regulation's meaning since it is not a medical report; and (2) since there was no preliminary hearing, the regulation's requirement for testimony to "later support[ ]" such evidence does not apply. We agree with both conclusions.

The LabCorp test results are not a "report, record, or statement" within the regulation's meaning. A regulation must be construed in harmony with the statutory scheme it is meant to help effectuate. *Kansas Comm'n on Civil Rights*, 212 Kan. at 402. And as the panel majority observed, K.S.A. 44-519 provides that:

"Except in preliminary hearings conducted under K.S.A. 44-534a and amendments thereto, no report of any examination of any employee by a health care provider, as provided for in the workers compensation act and no certificate issued or given by the health care provider making such examination, shall be competent evidence in any proceeding for the determining or collection of compensation unless supported by the testimony of such health care provider, if this testimony is admissible, and shall not be competent evidence in any case where testimony of such health care provider is not admissible."

Consistent with this statutory requirement, "[i]t is clear that in K.A.R. 51-3-5a, the administrative regulation relating to preliminary hearings . . . a special rule has been fashioned to allow medical reports or records to be considered by the ALJ at the preliminary hearing." *Roberts v. J.C. Penney Co.*, 263 Kan. 270, 281, 949 P.2d 613 (1997) (holding vocational expert's testimony inadmissible when the expert's opinion was

founded on health care providers' opinions that were neither supported by testimony nor admitted by stipulation).

Moreover, the regulation's sentence requiring a stipulation or testimony for use in fashioning a final award indicates the regulation is meant to mirror K.S.A. 44-519, because it requires that supporting testimony be by a person who would typically issue a report, record, or statement about a medical examination. The regulation says a "report, record, or statement" admitted at a preliminary hearing must subsequently be "supported by the testimony of the physician, surgeon, or other person making the report, record, or statement." Physicians and surgeons are "health care provider[s]" as that term is defined by the Act and used in K.S.A. 44-519. See K.S.A. 2019 Supp. 44-508(j) ("'Healthcare provider' means any person licensed, by the proper licensing authority of this state, another state or the District of Columbia, to practice medicine and surgery, osteopathy, chiropractic, dentistry, optometry, podiatry, audiology or psychology.").

The regulation's language indicates the promulgating authority must have intended the phrase "or other person making the report, record, or statement" to refer to people similar to physicians or surgeons—in other words, a person who would make a "report of any examination of any employee by a health care provider." K.S.A. 44-519.

"The rule of *ejusdem generis* has been applied in cases similar to this both in Kansas and other jurisdictions.

. . . .

"'Briefly stated, that rule is a well-known maxim of construction to aid in ascertaining the meaning of a statute or other instrument, the doctrine being that where an enumeration of specific things is followed by some more general word or phrase, such general word or phrase is to be held to refer to things of the same kind with respect to a

16

classification which immediately precedes it-that is to say, where general words follow particular words in an enumeration describing the subject matter, general words are construed to embrace only objects similar in nature to those enumerated by antecedent specific words.'" *Wulf v. Shultz*, 211 Kan. 724, 729, 508 P.2d 896 (1973).

See Scalia & Garner, Reading Law:  The Interpretation of Legal Texts 199 (2012) ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned . . . .").

The LabCorp test results are not a "report, record, or statement" of a physician, surgeon, or like person relating to a medical examination, and so they are outside the regulation's scope.

Additionally, the regulation as interpreted by the Board and Judge Green would establish a blanket rule prohibiting the use of hearsay statements, which is contrary to the statute enacted by the Legislature. See K.S.A. 2019 Supp. 44-523(a) ("The director, administrative law judge or board shall not be bound by technical rules of procedure, but shall give the parties reasonable opportunity to be heard and to present evidence, ensure the employee and the employer an expeditious hearing and act reasonably without partiality."). And the "'technical rules of procedure'" to which the statute refers "are those rules of civil procedure located in Chapter 60 of the Kansas statutes, particularly the rules of evidence set forth in Article 4." *Roberts*, 263 Kan. at 278. "Many of our cases have held that the common-law rules as to the competency of evidence are not to be strictly applied in workmen's compensation cases." *Love v. Kerwin*, 187 Kan. 760, 763, 359 P.2d 881 (1961). The regulations governing compensation proceedings also recognize this, providing that "[h]earsay evidence may be admissible unless irrelevant or redundant." K.A.R. 51-3-8(c).

17

Reading K.A.R. 51-3-5a to prohibit an ALJ or Board from considering "any . . . statement" of a person who does not testify when determining a final award would do more than provide greater specificity to the general rules laid out in the workers compensation statutes and caselaw. It would contradict the agency's own regulation permitting hearsay. See *Carnes v. Hannigan*, 27 Kan. App. 2d 237, 239, 3 P.3d 548 (1999) ("To determine the meaning of statutes and regulations, all provisions, *in pari materia,* must be construed together."); Scalia & Garner, Reading Law:  The Interpretation of Legal Texts 180 ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").

We also agree with the panel majority's reasoning that K.A.R. 51-3-5a relates to procedures for preliminary hearings and does not govern the admission of evidence not previously presented at a preliminary hearing. "As with statutes, the court must give effect to the intent expressed by the plain and unambiguous language in the regulation." *Pener*, 305 Kan. at 1208. The regulation's second sentence prohibits consideration of "the reports" when making a final award. This reference can only be to "[m]edical reports or any other . . . statements" that "shall be considered by the administrative law judge *at the preliminary hearing*." (Emphasis added.) K.A.R. 51-3-5a(a).

This is reinforced by the prohibiting language's command that the evidence must be "later supported by" the declarant's testimony. As the panel majority noted, this language "reasonably applies only to documents that were first presented at a preliminary hearing without the required testimony." *Woessner*, 56 Kan. App. 2d at 797. If the regulation did not focus solely on evidence presented at a preliminary hearing, it would not have specified what must happen "later" for the evidence to be considered in making a final award.

18

The Board erred as a matter of law by excluding the test results based on the regulation.

*General Evidentiary Rules for Workers Compensation Hearings*

Lastly, the panel majority determined the LabCorp test results were sufficiently reliable to be admissible under the general evidentiary requirements for workers compensation hearings. This holding contradicted the Board, which reasoned that,

> "[B]asic rules of evidence require that a proper foundation must be laid. Our Courts have concluded that '[e]stablishing the chain of custody is part of the foundation for the admission of physical evidence.' Without a demonstrable and reliable chain of custody, it would be impossible to conclude, beyond a reasonable doubt, that a given sample was from the claimant and that the same sample was used for the drug test."

The panel majority held the Board abused its discretion by excluding the lab results because they contained "sufficient indicia of reliability" to make them admissible, even though some evidence supporting chain-of-custody was hearsay—in particular, St. John's affidavit statements. *Woessner*, 56 Kan. App. 2d at 801. The panel noted D'Attilio's testimony about "each step" of Stormont-Vail's handling of the urine sample— from the time it obtained the sample until it was transferred to LabCorp. 56 Kan. App. 2d at 799-800. It cited St. John's affidavit, which noted LabCorp received the sealed sample with no evidence of tampering. 56 Kan. App. 2d at 785-86. And it noted Dr. Long testified to his belief from reviewing the records that "proper chain-of-custody procedures were followed" and that he had "'no doubt' that the test result was accurate." 56 Kan. App. 2d at 800.

19

We again agree with the panel majority's assessment of the test results' reliability. We have noted hearsay is generally admissible in workers compensation proceedings. Moreover, the Board abused its discretion by acting based on an erroneous view of the law when it insisted chain of custody be established beyond a reasonable doubt. See *Via Christi Hosps. Wichita, Inc. v. Kan-Pak, LLC*, 310 Kan. 883, 891, 451 P.3d 459 (2019) ("'Essentially, the test [for unreasonable, arbitrary, or capricious agency action] under K.S.A. 77-621[c][8] determines the reasonableness of the agency's exercise of discretion in reaching its decision based upon the agency's factual findings and the applicable law.'").

That beyond-a-reasonable-doubt burden of proof was borrowed from K.S.A. 2019 Supp. 44-501(b)(3)(E) that we have held does not apply to this case. And even under the rules of evidence otherwise applicable in judicial proceedings, such a strict standard is not required to demonstrate chain of custody. "The test for chain of custody is a reasonable certainty that the object has not been materially altered. Any deficiency in the chain of custody goes to the weight of the evidence rather than its admissibility." *State v. Horton*, 283 Kan. 44, 62, 151 P.3d 9 (2007). The supporting evidence before the Board demonstrated a reasonable certainty the sample LabCorp tested belonged to Woessner and was not materially altered from the time Stormont-Vail obtained it through the time LabCorp tested it.

The Board abused its discretion declaring the test results inadmissible under "[b]asic rules of evidence . . . ." It erred as a matter of law and acted unreasonably by excluding the test results.

20

*The Rebuttable Presumption on Contribution to the Accident*

Given our decision that the test results were admissible, Woessner is conclusively presumed by law to have been impaired at the time of his accident. Those results also trigger the rebuttable statutory presumption that his impairment contributed to the accident. We must next consider the Board's alternative reason for entering the award: its finding Carmen rebutted the statutory presumption on contribution. K.S.A. 2019 Supp. 44-501(b)(1)(D) (employee can overcome rebuttable presumption by presenting clear and convincing evidence that the impairment did not contribute to the injury, disability, or death). The Board addressed this as follows:

> "Finally, the Board finds that even if the drug screen test results are admissible, there was clear and convincing evidence rebutting the presumption that claimant was impaired at the time of his accident. Mr. McGraw, claimant's coworker, indicated claimant was a careful worker. He observed claimant shortly before his accident and he did not notice claimant acting any differently than he normally did. Mr. McGraw was asked if claimant exhibited several signs of using marijuana and answered in the negative."

Although cast in terms of impairment, which would be conclusively presumed from the drug test, the Board's finding was obviously calibrated to the fact issue properly before it, i.e., whether Woessner's impairment contributed to his accident. See K.S.A. 2019 Supp. 44-501(b)(1)(C)-(D).

On judicial review, Labor Max must demonstrate the Board's action was "based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act." K.S.A. 77-621(c)(7). The

21

appropriate standard of proof, dictated by K.S.A. 2019 Supp. 44-501(b)(1)(D), is clear and convincing evidence, which is defined as evidence causing the fact-finder to believe the truth of the facts asserted is highly probable. *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009).

In conducting the review demanded by K.S.A. 77-621(c)(7), the statute provides:

"For purposes of this section, 'in light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 77-621(d).

The record as a whole supports the Board's finding. Apart from the statutory rebuttable presumption that Woessner's impairment contributed to the accident, there are two strains of evidence in tension with this factual issue: McGraw's testimony and Dr. Long's testimony.

Carmen cites McGraw's detailed observations about Woessner and his interactions with him shortly before the accident. McGraw observed no signs of Woessner being impaired. Particularly relevant to the possible cause of Woessner's unexplained fall, McGraw did not perceive him stumbling, unable to concentrate, anxious, drowsy, sleepy, or speaking slowly. And he noticed nothing out of the ordinary about Woessner's appearance or behavior.

22

Labor Max cites Dr. Long's testimony to detract from the Board's finding. The ALJ observed that "Dr. Long noted that, unlike alcohol, which has physiological effects known to the general population, marijuana causes alterations in sensory input that may not be apparent to a layperson." According to the ALJ, "Dr. Long's testimony establishes that a layperson may not be able to detect impairment due to marijuana." But as Carmen points out, Dr. Long also testified he could only say the marijuana metabolite was present in Woessner's urine sample, but could not give an opinion on "the level of impairment. . . ." Labor Max also notes Carmen introduced a portion of the Merck Manual into evidence listing decreased motor abilities and depth perception and tracking impairment as effects of marijuana impairment.

In remanding the case to the Board for further proceedings on this factual issue, the panel decided it was "not comfortable evaluating this alternative basis for the Board's decision without a more complete explanation of why it found McGraw's testimony to meet the clear-and-convincing evidence test given Dr. Long's related testimony." *Woessner*, 56 Kan. App. 2d at 801. But it is not clear how much more the panel majority expected the Board to say on this point, and that expectation is plainly outside a court's role in judicial review of agency action. See *Jones v. Kansas State Univ.,* 279 Kan. 128, 142-43, 106 P.3d 10 (2005) (despite civil service board's failure to make explicit findings regarding claimant's intentional falsification of a report, board's decision supported by substantial competent evidence). Explanation of the Board's factual finding is just one factor to be considered on review, along with the other "relevant evidence in the record cited by any party" to support the finding. See K.S.A. 77-621(d).

The Board's decision does not reflect that it disregarded Dr. Long's testimony. It appears the Board appropriately weighed McGraw's testimony against Dr. Long's. And the Board's decision incorporates by reference the ALJ's factual findings, which

23

construed Dr. Long's testimony as casting doubt on a layperson's ability to recognize the alterations of sensory input from marijuana impairment in someone else. This reflects that the Board was aware of Dr. Long's testimony and nevertheless believed McGraw's testimony in finding Woessner's impairment did not contribute to his death.

Based on our standard for judicial review, we reverse the panel majority and affirm the Board. We hold sufficient evidence existed to support the Board's finding, in light of the record as a whole, that it was "highly probable" Woessner's impairment did not contribute to his accident.

Judgment of the Court of Appeals is reversed. The award entered by the Workers Compensation Board is affirmed.

MICHAEL E. WARD, Senior Judge, assigned.[1]

* * *

LUCKERT, C.J., concurring:  I agree with the plurality opinion in most respects but write separately to explain my analysis of K.A.R. 51-3-5a. I view the regulation as ambiguous and have considered and applied various canons and rules of construction to untangle the ambiguities. Although my analysis varies from the plurality opinion, it leads me to the same point:  I conclude the regulation allowed the administrative law judge to

---

[1]**REPORTER'S NOTE:**  Senior Judge Ward was appointed to hear case No. 119,087 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

consider LabCorp's report, even though it was introduced into the record without supporting testimony.

I agree with my colleagues—both those joining the plurality opinion and those concurring in part—as to the general principles that govern our analysis. In interpreting a regulation, courts apply the same rules as when interpreting a statute. That includes "giv[ing] common words their ordinary meanings, without adding to or subtracting from the text as it appears. We only resort to textual construction when the language is ambiguous." *Central Kansas Medical Center v. Hatesohl*, 308 Kan. 992, 1002, 425 P.3d 1253 (2018).

Looking first to the language of the regulation, K.A.R. 51-3-5a provides:

> "(a) Medical reports or any other records or statements shall be considered by the administrative law judge at the preliminary hearing. However, the reports shall not be considered as evidence when the administrative law judge makes a final award in the case, unless all parties stipulate to the reports, records, or statements or unless the report, record, or statement is later supported by the testimony of the physician, surgeon, or other person making the report, record, or statement. If medical reports are not available or have not been produced before the preliminary hearing, either party shall be entitled to an ex parte order for production of the reports upon motion to the administrative law judge."

Common words and plain language dominate the regulation. That does not make its meaning clear, however. Ambiguity exists in every sentence. When ambiguities arise in an administrative regulation, as part of the contextual construction, it "must be construed in harmony with the statute, so that it, as well as the statute, may be given effect." *Kansas Comm'n on Civil Rights v. City of Topeka St. Dep't*, 212 Kan. 398, 402, 511 P.2d 253 (1973).

The first ambiguity dividing the various jurists considering the claim arising from Gary Woessner's death is whether the first word of the regulation means the entire regulation applies only to medical documents. At first glance, because the word "medical" occurs only before the first "or," the initial sentence's structure seems to convey an intent to allow the hearing officer to consider both medical and nonmedical evidence. That is, it does not say medical reports or any other medical records or medical statements. But that interpretation is not clear because, in part, the reference to "other" records or statements does not explain if the "other" contrasts the subject-matter of the document—medical with nonmedical—or various terms used to describe a document— report with record or statement.

More ambiguity arises because the regulation does not help the reader know what distinguishes a report from a record from a statement. A report can also be considered a business record of the one writing the report and thus a medical record. And an evaluating physician makes a statement about medical matters. But, under the construction adopted by some, the word "medical" does not modify records or statements. Under their interpretation, arguably an administrative law judge can consider medical reports but cannot consider medical records or statements referred to in the report or that underlie the basis for opinions included in the report—an inherently unreasonable result that we avoid. *State v. Arnett*, 307 Kan. 648, 654, 413 P.3d 787 (2018).

These are just a few examples of the ambiguities, but the second sentence of the regulation suggests a path for resolving at least some of this ambiguity. It does so by conveying an intent to encompass all types of medical—rather than nonmedical reports, records, or statements. And it does not suggest an intent to have the regulation apply to nonmedical records, reports, or statements.

26

Several contextual clues lead me to this conclusion. One arises because the second sentence uses the word "reports" interchangeably with the phrase "reports, records, or statements." For example, it first states the rule that an administrative law judge cannot consider "the reports" when making a final award. But it then provides two exceptions both of which apply to reports *and* records *and* statements:  (1) if "parties stipulate to the reports, records, or statements" or (2) if "the report, record, or statement is later supported" by testimony. The only reason to provide exceptions for records and statements is if the intent was to include them in the prohibition along with reports. This context suggests an intent to use "reports" as shorthand for reports, records, and statements. And it reveals an intent to include all medical documents in the rule and its two exceptions.

The last part of the second sentence also suggests this intent by providing that the exception applies if the report, record, or statement is supported by the testimony of a physician or surgeon. A physician's or surgeon's testimony would support a medical record, but that testimony would not be necessary if the document was not medical in nature. Allowing for a physician or surgeon to testify in support of a report, record, or statement reveals an intent that all three types of documents be medical in nature.

Granted, as emphasized by some jurists trying to apply K.A.R. 51-3-5a, it also refers to supporting testimony by an "other person making the report, record, or statement." But this phrase alone does not reveal an intent to address nonmedical records because two canons of construction suggest that "other person" does not necessarily mean a nonmedical person. First, under the doctrine of *noscitur a sociis*, a word is known by the company it keeps such that, although doubtful as used alone, the meaning of a word may be clarified by reference to the words or phrases with which it is associated. See *Young Partners v. U.S.D. No. 214*, 284 Kan. 397, 408, 160 P.3d 830 (2007). Second, courts presume, under the doctrine of *ejusdem generis*, that where enumeration of

27

specific things is followed by a more general word or phrase, such general word or phrase is held to refer to things of the same kind, or things that fall within the classification of the specific terms. *State v. Moler*, 269 Kan. 362, 363, 2 P.3d 773 (2000). This last canon applies to both the listing of physician, surgeon, or other person making a report and to the opening clause of "[m]edical reports or any other records or statements."

In sum, the second sentence clarifies an intent that "any other" expands the word "reports" to include documents commonly described as records or statements but applies the modifier "medical" to all those records.

To say the regulation applies to medical documents and not to nonmedical ones is most consistent with workers compensation law in general. As the plurality opinion points out, in workers compensation proceedings, "[h]earsay evidence may be admissible unless irrelevant or redundant." K.A.R. 51-3-8(c). See *Neal v. Hy-Vee, Inc.*, 277 Kan. 1, 22, 81 P.3d 425 (2003). But K.S.A. 44-519 creates an exception to that general rule; the exception applies to health care provider reports of an examination of any employee:

> "Except in preliminary hearings conducted under K.S.A. 44-534a and amendments thereto, no report of any examination of any employee by a health care provider, as provided for in the workers compensation act and no certificate issued or given by the health care provider making such examination, shall be competent evidence in any proceeding for the determining or collection of compensation unless supported by the testimony of such health care provider, if this testimony is admissible, and shall not be competent evidence in any case where testimony of such health care provider is not admissible."

Construing K.A.R. 51-3-5a to apply to medical reports, medical records, and medical statements leads to a construction that is in harmony with the statute and other principles of workers compensation law and gives effect to K.S.A. 44-519. Finding this

28

harmony is especially important when applying administrative regulations. *City of Topeka St. Dep't*, 212 Kan. at 402.

As applied to LabCorp's report of its testing of Woessner's urine, the parties agree the report was nonmedical. This means it does not fall within the first sentence of the regulation.

If the first sentence does not apply, neither does the second because of the first three words of the second sentence:  "However, the reports . . . ." Both "however" and "the" refer the reader back to what was already said. See Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary (last visited August 18, 2020) (defining "however" as "in spite of that: on the other hand" and "the" as "a function word to indicate that a following noun or noun equivalent is definite or has been previously specified by context or by circumstance"). Ambiguity is interjected by the phrase "reports, records, or statements" used later in the sentence. But, as I have discussed, the interchangeable use of the three words throughout the regulation reveals an intent to encompass all medical documents, by whatever name.

These contextual clues lead me to conclude the second sentence relates only to documents considered at a preliminary hearing and does not include nonmedical documents.

I am also persuaded by other points made by the Court of Appeals majority and the plurality opinion of this court that I need not repeat. Cumulatively, those reasons and the ones I have discussed, lead me to conclude the administrative law judge could consider LabCorp's report at the final hearing without the support of accompanying testimony. I would hold that the Workers Compensation Board erred as a matter of law by excluding the test results because of the regulation. I join in the plurality opinion's

29

analysis and holdings about the Board's errors in concluding K.S.A. 2019 Supp. 44-501(b)(3) applies and in excluding the test results under the basic rules of evidence. And I agree with the plurality opinion's holding that the Board did not err in determining it was highly probable Woessner's impairment did not contribute to his accident.

* * *

WILSON, J., concurring: I agree with the plurality opinion's conclusion that sufficient evidence existed to support the Board's conclusion that Woessner's impairment did not contribute to his accident and, thus, agree that the Board's decision should be affirmed. Likewise, I agree that the Board incorrectly relied on K.S.A. 2019 Supp. 44-501(b)(3) to support its decision to exclude the LabCorp test results.

But I part from the plurality opinion with respect to its conclusion that the Board erred in excluding the LabCorp test results under K.A.R. 51-3-5a. To begin, I note that our starting point for the interpretation of regulations is identical to the way we assess statutes: the plain language of a regulation should be given effect, if possible. *Central Kansas Medical Center v. Hatesohl*, 308 Kan. 992, 1002, 425 P.3d 1253 (2018). This requires us to "give common words their ordinary meanings, without adding to or subtracting from the text as it appears[,]" and "[w]e only resort to textual construction when the language is ambiguous." 308 Kan. at 1002.

Thus, I question the plurality opinion's decision to begin its analysis by noting that, "A regulation must be construed in harmony with the statutory scheme it is meant to help effectuate." Slip op. at 15. While I do not disagree with that premise, it seems to put the cart before the horse. Unless we read K.A.R. 51-3-5a to be ambiguous on its face, I see no need to resort to the canons of construction to divine its meaning. Nevertheless, the plurality opinion does just that—at some length—before finally determining that the

30

second sentence of K.A.R. 51-3-5a(a)'s use of the phrase "the reports" "can only" refer back "to '[m]edical reports or any other . . . statements' that 'shall be considered by the administrative law judge at the preliminary hearing.'" Slip op. at 18.

Plain language is supposed to be just that—plain. To the extent a regulation's plain language conflicts with the statutory authority from which it is derived, the regulation may be unlawful—although such a challenge is not before us—and to the extent a regulation may be ambiguous, it must be *interpreted* to be in harmony with its authorizing statute, if possible. But, here, the plurality opinion begins by stating that the regulation cannot possibly mean what it says, then works backwards to arrive at the conclusion that it does not actually say what it says.

For example, the plurality opinion agrees with the majority below that "a test result is not a 'report, record, or statement[ ]' within the regulation's meaning since it is not a medical report[.]" Slip op. at 15. But K.A.R. 51-3-5a(a) does not speak solely to *medical* reports; instead, it begins by referencing "[m]edical reports *or any other records or statements*[.]" (Emphasis added.) In order to circumvent the plain language of the regulation, the plurality opinion defers to K.S.A. 44-519, from which K.A.R. 51-3-5a(a) ostensibly draws its authorization.

Unlike the plurality opinion, I cannot read "any other records or statements" to be limited to "a 'report, record, or statement' of a physician, surgeon, or *like* person relating to a medical examination[.]" (Emphasis added.) Slip op. at 17. The LabCorp test results plainly constitute "any other record[,]" and, as noted, the canons of construction— including the rule of *ejusdem generis* relied on by the plurality opinion to reach its interpretation—are inapplicable in the absence of textual ambiguity. See, *e.g.*, *Stewart v. Preferred Fire Ins. Co.*, 206 Kan. 247, 249, 477 P.2d 966 (1970) ("Before the rule of ejusdem generis can be applied the clause must be ambiguous."). Thus, I disagree with

31

the plurality opinion's substitution of "like person" for the regulation's use of "other person[.]" Slip op. at 16-17.

Likewise, I find the plurality opinion's speculation that the Board's interpretation would impermissibly carve out a "blanket rule prohibiting the use of hearsay statements" in workers compensation proceedings to be premature, if not misplaced. Slip op. at 17. If the plain text of the regulation, as applied by the Board, truly would give rise to such a rule—of which I am doubtful—then such a deficiency would seem to require correction by way of a challenge to the validity of the regulation itself, not an end-run around the regulation's plain language. As such a challenge is not presently before our court, the plurality opinion's expression of concern appears to presume the existence of an issue that is not ripe for adjudication at this time. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 892, 179 P.3d 366 (2008) ("To be ripe, issues must have taken shape and be concrete rather than hypothetical and abstract.").

Turning to the plurality opinion's second point, I again cannot agree that the absence of a preliminary hearing renders the second sentence of K.A.R. 51-3-5a(a) inapplicable to the case at bar. I share in Judge Green's assessment that "K.A.R. 51-3-5a(a)'s plain language also contains a rule on what evidence is admissible at a final award hearing." *Woessner v. Labor Max Staffing*, 56 Kan. App. 2d 780, 806, 437 P.3d 992 (2019) (Green, J., dissenting). And, also like Judge Green, I cannot read the plain language of the regulation to limit that rule solely to evidence that was presented first at a preliminary hearing. To the extent the plurality opinion divines support for this interpretation from the regulation's use of the words "later," I believe it misses the forest for the trees.

Beyond my disagreement with the plurality opinion's plain language reading of the regulation, I fear that its interpretation has the unintended effect of illogically creating

two distinct tiers of most evidence in workers compensation proceedings: one class of materials, which must be supported by either testimony or stipulation because it happened also to be offered at a preliminary hearing, and another that is totally unfettered by any requirements of reliability. This will only increase the uncertainty in the result of workers compensation litigation.

BEIER and ROSEN, JJ., join the foregoing concurring opinion.